# Richmond

A. Blanton French and Others v. Mary C. Beville.

January 15, 1951.

Record No. 3720.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*James Sheppard Potts, George W. Reilly* and *Sands, Marks & Sands*, for the appellants.

*Tucker, Mays, Cabell & Moore*, for the appellee.

HUDGINS, C. J., delivered the opinion of the court.

A. Blanton French and others instituted this suit under Section 64-84 of the Code to impeach the alleged will of

Charles Edward French, probated in an *ex parte* proceeding before the judge of the Chancery Court of the city of Richmond. From the decree establishing the will complainants appeal.

On January 7, 1949, Charles Edward French, a bachelor approximately 70 years of age, died at his home, 3115 Grayland Avenue, Richmond, Virginia. For 17 years preceding his death he had employed Mrs. Mary C. Beville, an elderly widow, as his housekeeper. For several months prior to his death, French had not been in good health, but his condition was not regarded as serious. He was not confined to the house, took daily walks, and as late as the latter part of December, 1948, performed his usual duties as an employee of the State Department of Agriculture.

On several different occasions French had talked to R. L. Crowder and Harvey S. Pitts, two old friends and neighbors, about making his will. He told Crowder that he was "going to look out for" Mrs. Beville. Pitts is a son-in-law of Mrs. Beville, operates a drug store in the community, and is a Notary Public.

Crowder worked at night and was in the habit of stopping by to see French on his way home from work. On the morning of November 20, 1948, as usual, he stopped by to see French. After a short visit with him, he left, but before reaching his home, which was across the street, French had Mrs. Beville call him back. Crowder testified that when he returned, French asked him to "help him" write his will. Crowder told French that he did not think he was qualified to do so, and suggested that he send for a lawyer or a Notary Public. French immediately instructed Mrs. Beville to telephone Harvey Pitts to come over and "help him make out his will."

Soon after Pitts arrived French, in the presence of Crowder, stated that he desired to make his will. French sat down on one side of the library table, Pitts on the opposite side, and Crowder on the chesterfield, several feet from the table. French told his two friends the different things "he wanted done." He began to write on a blank sheet

of note paper, but after writing awhile he became nervous, "got up * * * and walked around the room several times, * * * came back, * * * tapped on the table, and said 'Doctor (he called Pitts, the druggist, doctor) one thing I left off. I want to look out for Mrs. Beville, I want to leave her some money when I am dead and gone. * * * Put down a thousand dollars in cash and fifty dollars a month for so long as she lives.' " Pitts, with pen and ink, added to what French had written on the paper "Mrs. Mary C. Beville is to receive in cash $1,000.00 and the sum of 50.00 Per month during her lifetime." French then read what he and Pitts had written, signed the paper, gave it to Crowder and asked him to sign it. Crowder complied with this request by signing his name to the paper, after which he handed it back to French, who then gave it to Pitts and asked Pitts to sign it. Pitts wrote at the bottom of the paper to the left of Crowder's name the word "over." On the back he wrote the last eight lines, affixed his signature thereto, and handed it back to French. The completed instrument, with that part in the handwriting of Pitts italicized, is as follows:

"I Charles Edward French
being of sound mind and memory, but knowing the
uncertainties of human life do now make and publish this
my last will and testament, that is to say: at death,
after all honest debts are paid,
Having section in River View Cemetery put in perpetual
care,
and double stone put at head of my father & mother,
Francis Allen and Alice W. Leber French wife,
and Francis Allen French, Jr.
and Alice W. French Hughes,
and Charles Edward French,
Mrs. Mary C. Beville to have possession of the
home, 3115 Grayland Ave. during her life as

furnished, at death of said Mary C. Beville to be sold
and settled among heirs mention.

*Mrs. Mary C. Beville is to receive in cash $1000.⁰⁰*
*and the sum of 50⁰⁰ Per month during her*
*lifetime.*

 Seal
 Charles Edward French
 Nov 20-1948 ⎤
 ⎬ R.L.Crowder
over" ⎦

(On the back of the paper):

~~"The above Mrs. Mary C. Beville and~~
R. L. Crowder have this day personally
appear before as witnesses to Chas E. French
Signing the above statement.
Given under my hand and seal this
20th Day of November 1948
 Harvey S. Pitts
 My commission expires 3/16/51"

 Complainants introduced no evidence tending to prove
undue influence or mental incapacity of the testator; nor
did they introduce any evidence contradicting the testimony
of proponents as to the execution of the will.

Upon this state of the record the chancellor, in effect, instructed. the jury that the evidence raised no issue of fact upon which they were required to pass, and that he was of opinion that the uncontradicted testimony of proponents proved that the instrument was properly executed. Thereupon, the jury returned a verdict declaring "that the paper writing, dated November 20, 1948, is the last will and testament of Charles Edward French, deceased."

Complainants' first contention is that the evidence does not establish the proper execution of the will.

The basis for this contention is that it appears on the face of the instrument that Pitts signed his name for the purpose of certifying as a Notary that R. L. Crowder was a witness to the signature of Charles Edward French to "the above statement," and hence two competent witnesses did not subscribe the will as required by statute.

The pertinent requirements of the statute (Sec. 64-51) are that "the signature of the testator * * * shall be made or the will acknowledged by him in the presence of at least two competent witnesses, present at the same time; and such witnesses shall subscribe the will in the presence of the testator, but no form of attestation shall be necessary."

This court has repeatedly stated that the purpose of the statutory requirements for the execution of a will is to prevent mistake, imposition, fraud or deception, but these requirements are not intended to restrain or abridge the power of a testator to dispose of his property. They are intended to guard and protect him in the exercise of that power. *Moon* v. *Norvell*, 184 Va. 842, 36 S. E. (2d) 632; *Salyers* v. *Salyers*, 186 Va. 927, 45 S. E. (2d) 481; *Ferguson* v. *Ferguson*, 187 Va. 581, 47 S. E. (2d) 346.

In *Savage* v. *Bowen*, 103 Va. 540, 546, 49 S. E. 668, it was said:

"The purpose of the statutory requirements with respect to the execution of wills was to throw every safeguard deemed necessary around a testator while in the performance of this important act, and to prevent the probate of a fraudulent and supposititious will instead of the real one.

To effectually accomplish this, the statute must be strictly followed. It is, however, quite as important that these statutory requirements should not be supplemented by the courts with others that might tend to increase the difficulty of the transaction to such an extent as to practically destroy the right of the uninformed layman to dispose of his property by will."

Mr. Justice Spratley, speaking for the court in *Ferguson* v. *Ferguson*, 187 Va. 581, 591, 47 S. E. (2d) 346, in discussing that part of the statute which declares that "no form of attestation shall be necessary," said:

"Where, as in Virginia, a formal attestation is unnecessary, any form of signing a will with the intention of acting as a witness is sufficient. Attestation is mental, while subscription is mechanical. Attestation is the act of the senses and subscription is the act of the hand. To attest a signature means to take note mentally that the signature exists as a fact. *Tilton* v. *Daniels*, 79 N. H. 368, 109 A. 145, 8 A. L. R. 1073."

In *Pollock* v. *Glassell*, 2 Gratt. (43 Va.) 439, at page 464, this is said: "* * * The attestation is the act of the witnesses, and it was not intended to confide to them the duty of stamping their testimony upon the paper, which could avail nothing as evidence, however perfect, and which ought to occasion no estoppel, however imperfect.

&ast; &ast; &ast; &ast; &ast; &ast;

"I think it clear that the subscription of the witnesses is substantially the attestation contemplated by the statute; and it is sufficient if the purpose be indicated by the briefest memorandum, or merely by a fair presumption arising from the local position of their signatures upon the paper; and that whether a memorandum of attestation be general or special, it may be denied or contradicted by the subscribing witnesses, in the whole or in part, and, of course, is open to explanation if in any wise ambiguous."

It appears on the face of the instrument that the paragraph immediately above the signature of Pitts is an imperfect certificate to the effect that Crowder was a

witness to the signature of Charles Edward French. It neither adds to, nor subtracts from, the fact that Crowder was a witness to the signature, and, under the circumstances, it has no legal significance. As was said in the *Pollock Case*, *supra*, it may be contradicted or explained.

The testimony of Crowder and Pitts is in accord upon all pertinent and important issues. Their testimony is that French expressed a desire and determination to make a will. When Crowder declined to assist him in its preparation, he sent for Pitts, and after he arrived, French, in the presence of both Crowder and Pitts, wrote the greater part of the instrument, but becoming weak and nervous, he stopped writing and asked Pitts to write into the instrument an additional provision for Mrs. Beville. After Pitts had complied with this request, French read the entire instrument, signed it in the presence of Pitts and Crowder, two competent witnesses, each of whom, at his request, in his presence, and in the presence of each other, subscribed their names thereto. There was the concurrence of French's intention to make a will and his intention to sign the instrument as and for his will. French's request to Crowder and to Pitts to sign the will was couched in the same language. This language expressed the intention of the testator for the two parties to witness what he had done by signing their names to the instrument so that either, or both, could, at the proper time and place, testify to the authenticity of the completed document. The literal meaning of the word "subscribe," as used in the statute, is "to write underneath; sub, under; scribere, to write." Crowder did exactly what the testator asked him to do. Pitts did likewise and, in addition, without suggestion from French, wrote at the bottom of the paper the word "over," and on the back the paragraph appearing above his signature.

Pitts testified that when he read this paragraph he noticed that Mrs. Beville was not a witness to the instrument and that in order to correct his mistake he, with a pencil, drew several lines through the words "the above Mrs. Mary C.

Beville and," and then affixed his signature where it appears on the instrument. After this was done, he gave the paper to French, who seemed satisfied, and said that he was going to "put it in the glass door cupboard" in his dining room, "Where it would be," and where it was found after the death of French.

The facts in *Ferguson* v. *Ferguson, supra,* were somewhat similar to the facts now under consideration. In that case the signatures of the testator and witnesses appeared as follows:

his

"M. Calvin ✕ Lafew

Mark

"I, C.E.Trout, a Notary Public in and for the City of Roanoke, Va. do certify that M. Calvin Lafew, being unable to write his name on account of nervousness, has made his mark to the foregoing writing, as shown above, this 8th day of January, 1946.

C.E.Trout

Notary Public

My Coms. Expires April 26, 1949

"We as witnesses have this day signed our names in the presence of M. Calvin Lafew, and in the presence of each other.

Elisha J. Jacobs

Nancy C. Ferguson."

Notwithstanding the attestation clause the evidence created some doubt as to whether the witness, Jacobs, was present when the testator and the witness, Nancy C. Ferguson, signed the instrument. Under these circumstances, the validity of the will depended upon whether Trout was a competent witness. He testified that he wrote Lafew's name on the instrument and had him touch the pen while he (Trout) made the cross-mark. In explanation of why he signed it as a Notary Public, Trout said: "I did not know whether it was necessary or not, but I just thought being in the condition he was, that was being weak and

unable to sign his name, that probably would help to establish his mark and I signed it as a notary public."

Mr. Justice Spratley, speaking for the court in that case, said: "An attesting witness is one who signs his name to an instrument for the purpose of proving and identifying it, or one who signs with the intention of being considered a witness to an act in question. The validity of a will depends not on the attestation clause, but on the conformity of the execution to the requirement of the statute."

The validity of French's will does not depend on the imperfect certificate inserted by Pitts, but upon whether Pitts signed as a witness to the instrument, at the request of the testator. The simple fact that the witness wrote the superfluous paragraph should not invalidate the instrument, without which the uncontradicted testimony establishes proper execution.

The facts in this case are distinguishable from the facts in *Peake* v. *Jenkins*, 80 Va. 293, the main authority upon which complainants rely to support their contention. There Mary F. Holladay, not only wrote the instrument offered for probate as the will of Anna L. Jenkins, but signed it "Anna L. Jenkins," "By Mary F. Holladay." The name of one other person was signed to the instrument as a witness. The court, in holding that Mary F. Holladay was not a competent witness to the will, said that the testimony tending to prove execution did not show that the testatrix requested Mary F. Holladay to sign the instrument as a witness. The uncontradicted testimony in the present case is that the testator asked Pitts to sign the instrument. Moreover, in the *Peake Case* fraud was proven and the paper writing offered as a will was not of a testamentary character.

Complainants' second contention is that the relationship of Pitts to the beneficiary, his signature as a notary on the paper, and other irregularities appearing on the face of the instrument created such doubt as to the authenticity of the paper that the issue should have been submitted to the jury.

It must be remembered that the testator, Crowder and Pitts were laymen, with little, if any, experience in drafting

legal instruments. French and Crowder were neighbors and had been close friends for a number of years. Pitts was a druggist in the community, and approximately six months before November, 1948, had married Mrs. Beville's daughter. Pitts and French had been mutual friends for a period of more than twelve years. French, without solicitation, had loaned Pitts $2,500. The note executed by Pitts evidencing this indebtedness was found among the papers of the testator. There is no suggestion in the evidence that the existence of this indebtedness influenced Pitts in any way, or that he hoped to profit by the fact that Mrs. Beville was named principal beneficiary. He did not volunteer to assist French in the preparation of his will. Everything he did was at the specific request of French. He advised French to employ a lawyer to draft the will, but French wanted to write it then.

On the same day, and within a few hours after the will had been executed, Pitts returned to the home of the testator and again discussed the employment of a lawyer. During these discussions Pitts made notes of different things that French wanted done. These notes contained a more detailed description of the different parcels of real estate owned by French. After the notes had been completed, French signed them, and Pitts signed them as a witness. The notes were found with the will and were offered for probate, but the chancellor refused to probate them on the ground that there was only one witness to the testator's signature. It appears from these notes (filed as an exhibit with the evidence) that the dispositive provisions therein conform almost exactly to the provisions of the will as written and probated.

While French was on good terms with his brothers, his nieces and nephews, he never discussed making his will with any of them. He had discussed the subject several times with both Crowder and Pitts. Therefore, it seems natural that he should ask these neighbors and close friends to act as witnesses to his will.

It is not expressly stated in the certificate that Pitts

signed as a notary. The word "notary" does not appear in the instrument. It is true that the certificate above Pitts' name is somewhat similar to the form commonly used in taking an acknowledgment, and immediately after Pitts' name is the sentence "My commission expires 3/16/51." The statement of Pitts in the certificate to the effect that Crowder was a witness to Charles Edward French's signature is simply a part of the necessary proof of proper execution of the will. A witness to a will must be able to testify, not only that the testator signed his name, or acknowledged his signature in his presence, but that such signature was affixed, or acknowledgment of the instrument was made, in the presence of another person. In other words, the testator must sign his name, or acknowledge the instrument in the presence of at least two competent persons present at the same time.

The following irregularities do appear on the face of the instrument: (1) it is written in part with pencil and in part with pen and ink; (2) there is considerable space (2¼ inches) between the last dispositive provision of the will and the testator's signature; and (3) in the certificate the instrument is referred to as a "statement."

The testimony shows that French started to write his will with a pencil, but when he stopped and gave the paper to Pitts, with the request that he make the addition, Pitts used his pen. When the paper was passed back to the testator, he said that all legal instruments should be signed in ink. Thereupon, Pitts handed his pen to the testator, which he used in signing his name. When Crowder was asked to sign, he went to the table and picked up a pencil, which he used. Pitts testified that after he saw that he had mistakenly included Mrs. Beville's name in his certificate, he did use a pencil in his attempt to delete it. There was no significance in using the pencil rather than the pen. He had on his uniform coat in which he carried pen and pencils. While these incidents are rather unusual, the explanations are reasonably satisfactory.

There is considerable space between the dispositive pro-

visions of the will and the signature of French. The paper used was ordinary note paper, without lines, and the space does afford an opportunity for alteration of, or additions to, the will above the testator's signature, but it was not used for that purpose, and the positive and uncontradicted testimony is that the paper, as signed and probated, was the precise instrument executed on November 20th, most of which was in the handwriting of the testator.

The fact that Pitts, in his certificate, referred to the instrument as a "statement" is proof that Pitts was not accustomed to writing legal documents, and was not familiar with legal terminology. The erroneous use of the word "statement" is entitled to little, if any, consideration when weighed with the significant language used by the testator himself. He began his will: "I, Charles Edward French, being of sound mind and memory, but knowing the uncertainties of human life, do now make and publish this my last will and testament, that is to say: at death, * * *" The testator, not only intended the instrument to be his will, he emphasized that it was his will.

These irregularities, as explained by the subscribing witnesses, fall far short of proving fraud. They are not in themselves circumstances from which fraud may be inferred, as were the circumstances stated in *Barnes* v. *Bess*, 171 Va. 1, 197 S. E. 403, the authority upon which complainants rely. There the instrument offered for probate contained different provisions from the previously expressed intention of the testator. The subscribing witnesses testified that, as they recalled, the will which they subscribed contained only two pages, and the type on both was the same. The document offered for probate contained three pages, two of which were originals and the other a carbon copy. There was no evidence tending to show that the testator was under any obligation to Barnes, who was the draftsman, named as executor and principal beneficiary.

The court, dealing with this phase of the evidence, said: "The devise to Barnes (the draftsman) is so clearly disproportionate to the measure of services performed, and

the extent of the estate involved, as to bear the closest scrutiny. There is no satisfactory explanation why the alleged will contained both original and carbon copies. The manner in which the devise to Barnes is squeezed in near the bottom of the first page between a numbered and an unnumbered clause, gives further rise to suspicion."

On this and other evidence of like nature, this court affirmed the judgment of the trial court entered on the verdict rejecting the will.

 Fraud is seldom, if ever, provable by direct testimony, but usually must be shown by circumstances which are sufficient to convince fair-minded men that they would not have occurred without the existence of a fraudulent purpose and design. Fraud is a mixed question of law and fact but, in most cases, is a jury question. While fraud may be shown by circumstantial evidence, it must have a logical and substantial basis and can not rest upon vague suspicion and surmise.

 The irregularities do not create a substantial basis from which fraud may be inferred. In the light of the positive testimony, if the question of fraud had been submitted to the jury and a verdict returned against the will, it would have been the duty of the chancellor to set it aside. This being true, we find no reversible error in the chancellor's instruction to the effect that the evidence was insufficient to submit the question of fraud to the jury.

The decree of the chancellor is affirmed.

*Affirmed.*